```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF RHODE ISLAND

_____
                                   )
EZEKIAL JOHNSON, JR.,              )
                                   )
          Plaintiff,               )
                                   )
     v.                            )   C.A. No. 23-114 WES
                                   )
RHODE ISLAND DEPARTMENT            )
OF CORRECTIONS, WAYNE T.           )
SALISBURY, and JR VENTURA,         )
                                   )
          Defendants.              )
_____)
```

### MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

This case concerns alleged constitutional violations by Defendants, the Rhode Island Department of Corrections ("DOC"), DOC's Public Relations Director, JR Ventura, and DOC's Director, Wayne Salisbury, against pro se Plaintiff Ezekial Johnson, a Black man who is incarcerated at the DOC's Adult Correctional Institutions ("ACI"). Plaintiff requested permission to participate in a televised interview with a reporter for a local television station, which DOC officials denied. He claims that the denial was impermissibly based on race in violation of the equal protection clause of the United States Constitution and amounted to deliberate indifference by Defendants; he also seeks relief for these violations pursuant to 28 U.S.C. § 1983. In his

opposition to Defendants' Motion to Dismiss, he also raises a First Amendment claim. For the following reasons, Defendants' Motion to Dismiss, ECF No. 7, is GRANTED as to Plaintiff's equal protection claim against Defendants Salisbury and Ventura and Plaintiff's § 1983 claims against all Defendants.

I. Background

In late 2022, Plaintiff requested permission to participate in a televised interview with a reporter for a local television station. Compl. at 5-7, ECF No. 1. Defendant Ventura, in his capacity as Public Relations Director for the DOC, approved Plaintiff's request for an interview to take place on December 3, 2022. Id. at 5. On the morning of December 3, however, Warden Lynn Corry informed Plaintiff that the cameras would not be allowed into the facility and told Plaintiff that a future interview could take place in the larger visiting room at ACI's medium security facility. Id. Plaintiff then spoke to Defendant Ventura, who stated that the cameras had not been allowed in because the DOC was concerned about the impact that a televised interview could have on the family of the victim, Jose Rodriguez. Id. at 1, 5-6. Plaintiff inquired about a previous televised interview conducted with ACI inmate Freddie Bishop, who is white, in 2013, and questioned how the two situations were different other than the "color of [Plaintiff's] skin." Id. at 6. Defendant Ventura replied that he had not been employed by DOC at the time of Bishop's

interview but said that he would look into it and "inform his superiors."[1]  Id.

In February 2023, the reporter reached out to Ventura to request an interview of Plaintiff "with cameras."  Id. at 7. Plaintiff asserts that the reporter contacted the victim's family and the Attorney General's Office before making the request.  Id. Ventura denied the request "due to safety and security concerns." Id.  Plaintiff unsuccessfully attempted to challenge the denial by submitting a grievance to DOC and subsequently filed this lawsuit. Id.

---

[1] The Court takes judicial notice of the facts that Bishop's interview took place in 2013 and not in 2016 as alleged, and that Defendant Salisbury was not employed by the DOC at the time of the interview, both of which are matters of public record. See Parker Gavigan, WJAR, "I-Team: Freddie Bishop claims new evidence will clear him" (Nov. 12, 2013), https://turnto10.com/archive/i-team-09-16-2015-162248658; Parker Gavigan, NBC 10 News, "NBC I-Team: Judge grants request to test DNA in Freddie Bishop case" (Oct. 16, 2019), https://turnto10.com/i-team/nbc-10-i-team-judge-grants-request-to-test-dna-in-freddy-bishop-case ("During a 2013 prison interview with the NBC 10 I-Team, Bishop maintained his innocence in the Medeiros murder, although his DNA was found at the scene."); Jack Perry, The Providence Journal, "Fired twice and sued over an inmate's death, this former Wyatt warden will lead the RI DOC," https://www.providencejournal.com/story/news/politics/2023/01/20/wayne-salisbury-former-wyatt-detention-warden-now-interim-ri-doc-director/69818755007/; Watterson v. Page, 987 F.2d 1, 4 (1st Cir. 1993) (quoting Mack v. South Bay Beer Distrib., Inc., 798 F.2d 1279, 1282 (9th Cir. 1986)) ("[O]n a motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment.").

II. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), if a complaint fails to state facts sufficient to establish any claim that is "'plausible on its face,'" that complaint must be dismissed. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "[C]ourts must be mindful of the challenges faced by pro se litigants and construe their arguments liberally," but need not "conjure up unpled allegations." Vieira v. De Souza, 22 F.4th 304, 311 (1st Cir. 2022) (quoting McDonald v. Hall, 610 F.2d 16 (1st Cir. 1979)).

III. Discussion

A. Equal Protection Claim

To survive a motion to dismiss, a plaintiff alleging an equal protection violation must plead facts "plausibly demonstrating that 'compared to others similarly situated, [the plaintiff was] selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Mulero-Carrillo v. Román-Hernández, 790 F.3d 99, 106 (1st Cir. 2015) (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001)).

4

As to the individual Defendants, Plaintiff has not stated an equal protection claim. Neither Defendant Salisbury nor Defendant Ventura were employed by the DOC in 2013 and thus did not play a role in the decision to approve Bishop's interview. Compl. at 6; Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem") 5 & n.4, ECF No. 7-1. Therefore, Plaintiff cannot show that these Defendants acted inconsistently with that earlier decision in denying his request for a televised interview. See Lopera v. Town of Coventry, 640 F.3d 388, 403 (1st Cir. 2011) ("The [plaintiffs] do not cite any cases from this court or the Supreme Court finding a violation of the Equal Protection Clause in the absence of purposeful discrimination on the part of the relevant officials."); Jones v. Slade, 23 F.4th 1124, 1139 n.2 (9th Cir. 2022) ("We note that [plaintiff] cannot sustain his damages claim against [defendant] unless he can demonstrate that she personally applied [the policy] inconsistently."). Accordingly, Defendants' Motion to Dismiss, insofar as it concerns the equal protection claim against Defendants Salisbury and Ventura, is GRANTED.[2]

B. Deliberate Indifference

Plaintiff next alleges deliberate indifference by Defendants. Compl. at 3. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth

---

[2] Defendants do not appear to argue that Plaintiff's Equal Protection Claim against DOC should be dismissed.

5

Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994). Such claims generally arise in the context of the health or safety of prisoners. See, e.g., Wilson v. Seiter, 501 U.S. 294, 296-99 (1991) (collecting cases). There are two requirements for a deliberate indifference claim under the Eighth Amendment: "First, the deprivation alleged must be, objectively, 'sufficiently serious'" such that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" Farmer, 511 U.S. at 834 (citations omitted). Second, the "prison official must have a 'sufficiently culpable state of mind.'" Id. (quoting Wilson, 501 U.S. at 297). Here, Plaintiff has not alleged any facts demonstrating that Defendants inflicted upon him a "sufficiently serious" deprivation that "result[ed] in the denial of 'the minimal civilized measure of life's necessities.'" Id. (citations omitted). Accordingly, Defendants' Motion to Dismiss is GRANTED insofar as it concerns Plaintiff's claim of deliberate indifference.

C. Freedom of Press

In his reply to Defendants' opposition, Plaintiff requests that the Court interpret his Complaint to include a claim under the First Amendment, or, in the alternative, that the Court permit him to amend his Complaint to include such a claim. Pl.'s Resp. 5-6, ECF No. 8. Although Plaintiff has "failed to comply with the strict requirement" of Local Rule 15 "that he must file a copy of

6

[any] proposed amended pleading," Hanson v. R.I. Dep't of Corrections, No. 17-cv-598, 2019 WL 6324653, at *1 (D.R.I. Nov. 25, 2019), in light of Plaintiff's pro se status and the fact that Defendants had the opportunity to fully brief the merits of this issue in their Reply, see Defs.' Reply 4-6, ECF No. 10, the Court interprets the statement in Plaintiff's Response as a motion to amend his Complaint. However, because such an amendment would be futile, Plaintiff's request is DENIED.

Under Federal Rule of Civil Procedure 15(a), "leave [to amend] shall be freely given when justice so requires." However, leave to amend may be denied if there is an adequate reason, such as futility. Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996). "'Futility' means that the complaint, as amended, would fail to state a claim on which relief could be granted." Id. Accordingly, the Court turns to whether Plaintiff has stated a First Amendment claim.

To the extent that Plaintiff frames his First Amendment claim as one of "freedom of the press," he lacks standing to assert that claim based on the First Amendment rights of a third party. See Wine & Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 49 (1st Cir. 2005) ("A party ordinarily has no standing to assert the First Amendment rights of third parties."); Citizens United v. Federal Election Comm'n, 558 U.S. 310, 390 (2010) (Scalia, J., concurring) ("The freedom of 'the press' was widely understood to

7

protect the publishing activities of individual editors and printers," which may extend to newspapers and other publication entities); Branzburg v. Hayes, 408 U.S. 665, 703 (1972) ("[T]he traditional doctrine [is] that the liberty of the press is the right of the lonely pamphleteer . . . just as much as of the large metropolitan publisher . . .").

Plaintiff's claim under the free speech clause, too, is unavailing. In Turner v. Safley, in the context of a First Amendment challenge to a prison policy restricting correspondence between inmates at different institutions, the Supreme Court announced the standard for assessing such constitutional claims: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). The Court noted that "several factors are relevant in determining the reasonableness of the regulation at issue": whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," "whether there are alternative means of exercising the right that remain open to prison inmates," "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and the presence or "absence of ready alternatives." Id. at 89-90.

Numerous courts have had occasion to consider prison policies or decisions that limit or outright ban face-to-face media interviews with individual inmates and have universally concluded that the safety and security concerns that could arise from allowing televised interviews with inmates were sufficient to justify those policies or decisions. See, e.g., Hale v. Fed. Bureau of Prisons, 759 F. App'x 741, 753 (10th Cir. 2019) ("[W]e have little difficulty concluding that denying [plaintiff] the opportunity to publicly protest his innocence, in the media market where his crimes occurred, promotes safety and security interests inside and outside [the prison]."); Hanrahan v. Mohr, 905 F.3d 947, 959 (6th Cir. 2018) (citing prison's "fear that [interviewed] prisoners would thereby gain a disproportionate degree of notoriety and influence among their fellow inmates, leading to substantial disciplinary problems that could engulf large portions of the prisons"); Sidebottom v. Schiriro, 927 F. Supp. 1221, 1223 (E.D. Mo. 1996) ("Each one of these video interviews has required previous clearance, a security search of the reporter and his equipment, and a meeting with the reporter and the inmate in a controlled setting . . . . Any task which directs staff attention away from its mission of running a prison presents a security risk. Interviews and the presence of media can increase this risk and act as an unnecessary catalyst in the delicate prison environment.").

Courts have also identified alternative means of exercising the right, which are present in this case. Even when face-to-face interviews are prohibited, inmates retain the ability to communicate with the press through the mail or "through their families, friends, clergy, or attorneys who are permitted to visit them at the prison." Pell v. Procunier, 417 U.S. 817, 819, 825 (1974); see Morgan v. Cochise Cnty. Bd. of Supervisors, 487 F. Supp. 3d 789, 804 (D. Ariz. 2020), affirmed, 859 F. App'x 214 (9th Cir. 2021) (citing Pell, 417 U.S. at 824) ("As long as there is an alternative means of communication, restricting face-to-face media interviews with inmates does not violate inmate or media First Amendment rights."). Here, not only were these alternate avenues of communication available to Plaintiff, but he was also permitted to participate in the interview as planned, just without the presence of cameras. Compl. at 6. "[Plaintiff]'s ability to communicate with the media as authorized supports this Court's determination that [his] First Amendment rights have not been violated." Hatch v. Lappin, 660 F. Supp. 2d 104, 109 (D. Mass. 2009). Accordingly, Plaintiff's request to amend his Complaint to add a claim under the First Amendment is DENIED because such an amendment would be futile.

D. Section 1983

Finally, Plaintiff seeks to hold Defendants liable for violating his constitutional rights via 28 U.S.C. § 1983. Compl.

at 3.  To state a claim for relief under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).  As discussed above, Plaintiff has failed to state a claim for violation of his equal protection or First Amendment rights by Defendants Salisbury and Ventura, so relief under § 1983 is not available to him as to these claims.  As to Defendant DOC, a state agency, "[i]t is well settled beyond peradventure . . . that neither a state agency nor a state official acting in his official capacity may be sued for damages in a § 1983 action."  Destek Grp., Inc. v. State of N.H. Pub. Utils. Comm'n, 318 F.3d 32, 40 (1st Cir. 2003).   Therefore, Defendants' Motion to Dismiss is GRANTED insofar as it concerns Plaintiff's claims brought via § 1983.

IV. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED as to Plaintiff's equal protection claim against Defendants Salisbury and Ventura and Plaintiff's § 1983 claims against all Defendants.[3]  Plaintiff's request to amend his Complaint to add a claim under the First Amendment is DENIED.


IT IS SO ORDERED.

*/s/ William E. Smith*

William E. Smith
District Judge
Date:  August 31, 2023

---

[3] Plaintiff's equal protection claim against DOC remains. <u>See</u> supra at note 2.